UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CLARENCE DEAN, Personal Representative of the Estate of Jesse Dean, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF CALHOUN, MICHIGAN, UNITED STATES OF AMERICA, ASHLEI PACKER, RN, NATHAN MEYER RN, EIR PRATT, LNP, MEGAN GREENLEE, RN, JESSICA GODZIEBLEWSKI, RN, HEALTH SERVICES ADMINISTRATOR, PAUL TROOST, DO, and JOHN OR JANE DOE, <br><br> Defendants. | Case No. 1:23-cv-00408-RJJ-RSK <br><br> Honorable Robert J. Jonker <br><br> Magistrate Judge Ray S. Kent <br><br><br> **FIRST AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br>(except for FTCA claim) |

## INTRODUCTION

1. Jesse Dean was an Immigration Customs Enforcement [ICE] detainee held at the Calhoun County Jail [jail] in Battle Creek, Michigan. He arrived at the jail on December 31, 2020. Shortly after arriving, he sought medical care for serious medical symptoms. His complaints were repeatedly dismissed and his symptoms ignored. After suffering from severe pain for over a month, he died on February 5, 2021, of a treatable condition.

## PRELIMINARY STATEMENT

2. This is a civil rights action in which the plaintiff, Clarence Dean, seeks relief for the defendants' violation of Jesse Dean's rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, rights secured by the fifth and fourteenth amendments to the United States Constitution,

1

and an action pursuant to the Federal Torts Claims Act. The plaintiff seeks damages, both compensatory and punitive, affirmative and equitable relief, an award of costs, interest and attorneys' fees, and other and further relief as this Court deems just and equitable.

## JURISDICTION

3. This Court's jurisdiction is invoked pursuant to 28 U.S.C. 1331 and 1343 (a)(3). The substantive claims herein arise under 42 U.S.C. 1983, violations of civil rights, and the fifth and fourteenth amendments to the United States Constitution. The Federal Tort Claims Act claims are before this Court pursuant to 28 U.S.C. 1346.

## THE PARTIES

4. Plaintiff Clarence Dean of Nassau, Bahamas, brother of Jesse Dean, is the personal representative of the Estate of Jesse Dean.

5. The defendant, Calhoun County, is a county within the State of Michigan, and is responsible for the inmates and detainees at the jail.

6. The defendants Packer, Meyer, Greenlee, Troost and Pratt are responsible for providing healthcare to inmates and detainees at the jail, and are sued in their individual capacities.

7. Defendant Godzieblewski is the Health Services Administrator at the jail and is being sued in her supervisory and individual capacity.

8. Defendant John or Jane Doe is an unknown agent or employee of Corizon Health Care or Calhoun County who lied to the Bahamian Consulate or gave false information to Deportation Officer Joseph K. Fish about Mr. Dean's care and condition.

9. Defendant United States is the defendant in the FTCA claim.

## FACTUAL ALLEGATIONS

10. Mr. Dean entered into the United States from the Bahamas on a tourist visa.

11.     Corizon Healthcare, and its various subsidiaries, successors or alter egos (Corizon), had a contract with defendant Calhoun to provide medical care to the inmates and detainees at the jail.

12.     That contract initially was for a five year period commencing January 1, 2015, ending December 31, 2019, although defendant Calhoun's relationship with Corizon dated back to 1999.

13.     Pursuant to that original contract, the contract was renewed for 2 one- year terms. Therefore, the contract was in effect between December 31, 2020 and February 5, 2021, the dates when Mr. Dean was at the jail.

14.     On December 31, 2020, Mr. Dean was transferred to the jail as an ICE detainee.

15.     On January 2, 2021, Mr. Dean submitted a sick call form stating he had abdominal pain. From that day until his death a month later, Mr. Dean complained of abdominal pain related issues at least 27 documented times. On at least 14 separate occasions Mr. Dean submitted requests about his health concerns.

16.     On January 14, 2021, defendant Godzieblewski, in response to Mr. Dean's complaining of stomach pain and loss of appetite, ordered that Mr. Dean be provided a liquid diet for four days. She did nothing else to address Mr. Dean's health concerns. She did nothing to have the medical staff, whom she supervised, assess or treat Mr. Dean.

17.     On January 22, 2021, Mr. Dean was seen by an unknown licensed practical nurse (LPN), in connection with his complaint of "a great deal of abdominal pain." He was given acetaminophen, but this LPN did not contact a provider (M.D., D.O., L.N.P, or P.A.) or do anything else.

18.     While at the jail, this was the only time Mr. Dean was given any pain medication.

The failure of the defendants to treat his pain evinced deliberate indifference to Mr. Dean's serious medical condition and needs.

19. On January 24, 2021, Mr. Dean submitted a request notifying medical that he had lost 20 pounds in the last three weeks, was weak, could not eat regular meals, had severe stomach pains all night, and needed a special diet to address the matter.

20. An unknown member of the jail or medical staff responded to Mr. Dean, stating that his Body Mass Index was fine, and that he should buy food out of the vending machine or have someone send him a care package if he was hungry. They did nothing to treat Mr. Dean. None of the nurse defendants referred Mr. Dean's concerns to a medical provider or gave him any medical treatment for his concerning symptoms of significant weight loss, severe stomach pains, and inability to eat regular meals.

21. On the same day, an unknown LPN replied to Mr. Dean's request notifying him that the providers were treating him using their gastrointestinal protocol and threatening him that "repeated and excessive requests on the same topic" may result in a citation for interference with staff duties.

22. The next day, on January 25, 2021, Mr. Dean reported to his housing unit deputy that he felt like he was going to die. When an unknown jail or medical staff person arrived at his housing unit, Mr. Dean told her he was in extreme abdominal pain and when she declined to send him to the hospital, Mr. Dean offered to pay for the hospital visit.

23. That individual claimed to tell Mr. Dean that a provider would see him in the morning. He was not scheduled to see a provider.

24. On January 26, 2021, the day the defendants claimed they scheduled Mr. Dean to be seen by a provider, Mr. Dean submitted another request stating he had been in severe pain for

three weeks and needed emergency care.

25. Mr. Dean was not seen by a provider until January 27, 2021.

26. On January 28, 2021, defendant Troost received laboratory results showing "profoundly" low sodium levels that were not accounted for by sample error. This should have resulted in emergency evaluation and hospitalization. There were other lab findings that pointed to a GI bleed that were never followed up. His kidney impairment, elevated potassium level, and a significantly elevated lactate dehydrogenase level all was likely caused by Mr. Dean's bleeding ulcer. While hemolysis could have explained some abnormalities, it was imperative to verify. Mr. Dean was dying and Defendant Troost did nothing.

27. In the morning hours of January 30, 2021, Mr. Dean was seen by defendant Ashlei Packer for abdominal pain that was making it hard for him to breathe. Both his severe abdominal pain and difficulty breathing were indications that he should be seen by a provider. However, defendant Packer did not check his vitals and did not have him seen by a provider. She charted "no further treatment indicated." She also administered a medication to Mr. Dean without authorization and did not document the medication administration, both of which are serious breaches of nursing practice.

28. In the late night of January 30, 2021, Mr. Dean submitted two more requests, one asking for help for severe pain and the other stating once again he felt like he was going to die. However, defendant Ashlei Packer assessed Mr. Dean that evening, documenting there were "no abnormal findings."

29. Other detainees and correction officers repeatedly told the medical defendants about Mr. Dean's declining condition, but their concerns were ignored as well.

30. On January 31, 2021, Mr. Dean was seen by defendant Meyer for significant pain

in his abdomen. Defendant Meyer had a conversation with Mr. Dean about his issues being related to his mental state and suggested that he talk to someone in mental health. Meyer did this despite being aware of Mr. Dean's constant pain and deteriorating medical condition. He knew that all the evidence showed that Mr. Dean's symptoms were caused by a serious medical condition. He did not perform an abdominal exam, nor notify a provider. He did nothing to address Mr. Dean's medical concerns or conditions. His failure to adequately address Mr. Dean's concerns evinced deliberate indifference to Mr. Dean's medical concerns and condition.

31. Nurses do not have formal training in diagnosing or ruling out medical conditions, including those that are life-threatening. Numerous times during Mr. Dean's care, the defendant nurses attempted to minimize or diagnose his serious symptoms but failed to notify a provider regarding Mr. Dean's dangerous symptoms (e.g. "inmate is still stable at this time and no further treatment is indicated"). The repeated examples of nursing staff breaching their scope of practice and showing indifference to Mr. Dean's suffering resulted in the failure of Mr. Dean ever getting a proper evaluation or treatment for his abdominal pain and ultimately caused his death.

32. On January 31, 2021, on two separate occasions, defendants Nathan Meyer and Ashlei Packer assessed Mr. Dean for complaints of abdominal pain. Although Ashlei Packer supposedly referred Mr. Dean to be seen by a provider on February 1, 2021, this never occurred. Neither defendants, Meyer nor Packer, did anything else to address his deteriorating medical condition.

33. Additionally, on or about that same day, Mr. Dean contacted his sister, Sharon Dean. He described to her his pain, worsening symptoms, that he had collapsed twice and he felt like he was dying, and the failure of the defendants to treat him. Sharon notified the Bahamian Consulate of the situation.

34. The Consulate contacted Deportation Officer Fish and/or the jail about the situation but the defendants did nothing in response.  Supposedly, defendant John or Jane Doe told Fish that all was well.  The Consulate responded to the family "Good evening Ms. Dean, Vice Consul Gibson spoke with Fish this morning and Fish advised that Mr. Dean was seen by medical staff who 'confirmed he is not gravely ill, nor does he suffer from any debilitating sickness. It appears that your brother suffers from hypertension and high cholesterol and that these conditions are not threatening his life at this time.'" This was a lie and an effort to deceive Mr. Dean's family.  In fact, Jesse Dean died shortly thereafter.

35. He was supposedly scheduled to see a provider on February 1, 2021. This never happened.

36. On February 2, 2021, defendant Greenlee responded to Mr. Dean's "losing consciousness" and complaining of abdominal pain. Suddenly passing out is a very concerning symptom and should be followed by a prompt evaluation in an emergency room. There is evidence that defendant Greenlee never requested evaluation by a provider, referred him to an emergency room, nor was a more thorough evaluation of his heart or review of his labs performed. Defendant Greenlee also never weighed Mr. Dean despite his significant weight loss. Defendant Greenlee did nothing to address Mr. Dean's medical issues. This again deviated from the standard of care and showed a deliberate indifference to Mr. Dean's severe pain and the medical condition that was causing it.

37. On February 4, 2021, defendant Packer assessed Mr. Dean due to his advising her that his abdominal pain was "so bad it caused him to get dizzy and fall." She did not perform an abdominal exam or escalate care to a provider so he could receive treatment for his pain. This again deviated from the standard of care and showed deliberate indifference to Mr. Dean's severe

7

pain and medical condition.

38. On February 4, 2021, after fainting during the early morning pill call, Mr. Dean reported his abdominal pain was so bad that it was making him dizzy. Defendant Packer came to Mr. Dean's housing unit and took his vital signs but did not conduct an abdominal exam. Nor did she contact a provider or get Mr. Dean to a hospital.

39. Defendant Packer documented that she thought Mr. Dean's complaints were more of a behavioral issue than anything. She did this despite Mr. Dean's constant and serious medical issues which she was well aware of. On February 4, 2021 at 9:35pm, due to Mr. Dean's prior complaints of abdominal pain and again feeling dizzy, Mr. Dean was transferred to a cell in administrative segregation for medical observation. At 9:42pm, defendant Packer, the same nurse who had assessed Mr. Dean earlier that morning and documented that Mr. Dean still complained of abdominal pain, saw Mr. Dean but she again did not conduct an abdominal exam. Nor did she contact a provider or get Mr. Dean to a hospital. She did nothing.

40. At no time, from this assessment until 7:34am the next morning, did any medical staff check on Mr. Dean's wellbeing.

41. Throughout the evening of February 4, 2021, to the morning of February 5, 2021, Mr. Dean knocked on the large glass window in his cell five separate times to ask for water. Only on one occasion did an unknown staff member walk over to Mr. Dean to speak with him. They told Mr. Dean he could get water out of the sink in his cell as they were not allowed to give Mr. Dean a cup. Mr. Dean notified them that he could not get up, and even though he was in the cell for medical observation, nobody did entered his cell to assist him. Mr. Dean then struggled to get up and walked over to the sink, hunched over, to get a sip of water. Again nobody did anything.

42. On February 5, 2021, at approximately 7:34am, defendant Pratt approached Mr.

8

Dean's cell to administer his morning medications. She noticed Mr. Dean was struggling to stand up. As a result, she took Mr. Dean's vital signs. He had a critically low blood pressure reading of 88/48. She did not contact a provider or do anything else to address either his difficulty in standing or his blood pressure. Mr. Dean was dying and she did nothing. Had she addressed these issues Mr. Dean would be alive today.

43. At 7:40am, an unknown medical staff member arrived and assessed Mr. Dean. In her notes, she claimed Mr. Dean denied any chest pain or shortness of breath, but Mr. Dean reiterated that he felt weak. At 7:45am, a nurse escorted Mr. Dean to the medical unit in a wheelchair, where he was given an intravenous line for hydration.

44. At 10:39am, a jail deputy delivered Mr. Dean his lunch, and upon encountering Mr. Dean in distress, notified P.A. Appleby who was standing nearby. At 10:41am, defendant Pratt and P.A. Appleby and one of the defendant providers entered Mr. Dean's room with an electrocardiogram (EKG) machine and completed an EKG and blood sugar check.

45. Mr. Dean became unresponsive, and the deputy called an emergency response over the radio at 10:42am; Master Control then called for emergency medical services (EMS). At approximately 10:44am, medical staff placed Mr. Dean on supplemental oxygen. Mr. Dean's respirations, however, became variable at 5 to 20 breaths per minute. The normal range is 12-20 breaths per minute. This represented agonal breathing. The final breaths of a dying man. Mr. Dean was dying.

46. At 10:55am, EMS arrived in the medical unit and took over Mr. Dean's care; 11 minutes later, EMS left the medical unit with Mr. Dean. EMS documented when they arrived on the scene that Mr. Dean was in critical condition, unresponsive to stimuli and he was pale and sweating heavily. On their way to the ambulance, Mr. Dean stopped breathing.

47. At 11:07am, Mr. Dean was placed into the back of the ambulance, which was located in the jail sally port. At approximately 11:09am, a paramedic advised that they needed to start cardiopulmonary resuscitation. Mr. Dean went into cardiac arrest and two jail sergeants rotated chest compression responsibilities until 11:14am, when local fire rescue arrived with an automatic chest compression device and assumed CPR responsibilities.

48. At 11:38am, while still in the ambulance in the jail's sally port, as CPR efforts proved futile, EMS called a Bronson Battle Creek Hospital Emergency Department physician, who pronounced Mr. Dean's death.

49. Despite Mr. Dean's repeated complaints about losing weight, and his obvious weight loss, the defendants, on the occasions they did take vital signs, never weighed him. One defendant, despite Mr. Dean's obvious weight loss and never having weighed him, inexplicably documented that Mr. Dean had not lost weight.

50. On numerous occasions the chart indicated "hemoccult cards x3 and orthostatic vital signs are required if GI bleed is suspected." This was never done.

51. Mr. Dean had weeks of severe abdominal pain and considerable weight loss. In addition, he had concerning symptoms such as passing out and marked lab abnormalities. These necessitated emergency evaluation with comprehensive lab testing and CT imaging of his abdomen to determine the cause of his symptoms. Despite all of these concerning findings, the defendants failed to provide a proper evaluation of Mr. Dean despite dozens of pleas for help from Mr. Dean. Nursing staff repeatedly failed to escalate care to providers, even threatening Mr. Dean with discipline for seeking help. Defendants dismissed objective evidence of his worsening health and failed to address markedly abnormal lab findings. This failure of numerous medical staff defendants to provide appropriate evaluation over the course of weeks was tantamount to doing

nothing. This ultimately led to his death.

52. Mr. Dean died of an untreated ulcer that eventually eroded into a blood vessel, causing a massive GI bleed. His death could have easily been prevented with appropriate evaluation and treatment. Over a period of weeks, the defendants repeatedly failed to provide him appropriate evaluation necessitated by his worsening condition despite the concerns of Mr. Dean, correctional officers, other inmates/detainees, and the Bahamian embassy. The defendants in reckless disregard to his severe medical condition, stood by and watched Mr. Dean slowly die in pain.

## INVESTIGATIONS

53. ICE conducted an investigation into Mr. Dean's death at the jail and found numerous instances of significant lapses in the medical care provided to Mr. Dean. The allegations in this complaint came in substantial part from that investigation. Plaintiff incorporates the report of that investigation as if it was pleaded here.

54. Similarly, the Office of the Inspector General of ICE issued a report dated February 1, 2023. The IG evaluated the medical care provided nationwide to ICE detainees. In their self-serving report, they found that there were no problems with that medical care save one. That one was Mr. Dean. The IG's review of the medical files and autopsy report determined that Calhoun County Jail medical staff should have acted more swiftly to meet Mr. Dean's needs after correlating his complaints of worsening symptoms, significant weight loss, hypotension, and fall events. The report found that they did not take the appropriate action to address his continued gastrointestinal complaints, and thus the Inspector General's Report determined that the care provided was not appropriate.

### FIRST CAUSE OF ACTION. CIVIL RIGHTS VIOLATION AGAINST THE INDIVIDUAL DEFENDANTS

55. Plaintiff realleges paragraphs 1-54 above.

56. Defendants, Godzieblewski, Packer, Pratt, Meyer, Greenlee and Troost acting under the color of state law were deliberately indifferent to Mr. Dean's medical condition and needs.

57. The individual defendants acted in violation of Mr. Dean's fifth and fourteenth amendment rights under the United States Constitution.

58. A reasonable person in the position of the above-named individual defendants would know or should have known that Mr. Dean's medical condition posed a serious risk to Mr. Dean's health or safety. In fact, the evidence showed they did know.

59. The above named individual defendant's recklessly ignored that risk.

60. This deliberate indifference was the proximate cause of damage to Mr. Dean including, but not limited to, excruciating pain and suffering, loss of enjoyment of life, and his resulting death.

61. Deportation Officer Fish misled the Bahamian Consulate about Mr. Dean's medical condition. Deportation Officer Fish also misled the Bahamian Consulate about the medical treatment being afforded to Mr. Dean. These mistatements were prompted by the lies told to Fish by defendant John or Jane Doe.

62. John or Jane Doe told these lies intentionally and with reckless disregard for the truth. This conduct was a due process violation that shocks the conscience.

63. John or Jane Doe, through Fish told these lies to the Bahamian Consulate and through them to the plaintiff and other family members almost a week prior to Mr. Dean's death. More likely than not this prevented any intervention that would have changed the course of Mr.

Dean's medical treatment and saved his life. This cover up was one of the proximate causes of Mr. Dean's death.

## SECOND CAUSE OF ACTION, CML RIGHTS VIOLATION
## AGAINST DEFENDANT CALHOUN COUNTY

64. Plaintiff realleges paragraphs 1-63 above.

65. Defendant Calhoun contracted with Corizon to provide medical care to its inmates and detainees.

66. As defendant Calhoun was well aware, Corizon had a long history of providing unconstitutionally deficient health care to inmates and detainees around the country.

67. Despite this awareness, defendant Calhoun, whose relationship with Corizon dated back to 1999, repeatedly renewed their contract with Corizon.

68. Some of Corizon's history is set out in an article written by Greg Dober in the March 2014 issue of Prison Legal News.

69. Evidence of Corizon's history of deliberate indifference to inmates' medical needs is also set out in Johnson, et al v. Corizon Health Inc., et al, 6: 13-cv· 1855-TC, United States District Court for the District of Oregon (2015).

70. Other examples are described in a 2015 article entitled "Corizon Health Services Breaks Second Death Settlement Record This Year" in Shadow of Proof.

71. Nonetheless, defendant Calhoun was deliberately indifferent to the medical needs of inmates and detainees at the jail by maintaining its contract with Corizon and renewing that contract every few years.

72. Also, Calhoun County had a policy, custom or practice of failing to provide sufficient medical care for inmates and detainees, including, Mr. Dean. They include but are not limited to:

A. A policy, custom or practice of failing to follow the staffing guidelines as set forth in standards published by the National Commission of Correctional Healthcare; namely, the failure to have a Responsible Health Authority (RHA) overseeing the medical staff.

B. A policy, custom or practice of providing financial incentives to employees who limited emergency room visits by inmates or detainees.

C. A policy, custom or practice of failing to train its employees in the recognition of severe, progressive, and life-threatening medical conditions, such as Mr. Dean's.

D. A policy, custom or practice of failing to discipline or reprimand employees who do not follow company policies and/or standards that put inmates' health at risk;

E. A policy, custom or practice of denying inmates and detainees access to appropriate, competent and necessary care for serious medical needs;

F. A policy, custom or practice of failing to provide adequate supervision to medical personnel by an on-site physician;

G. A policy, custom or practice of denying inmates necessary medical care to save money and resources if an inmate or detainee is thought to be serving a short sentence or to be released shortly;

H. A policy, custom or practice of discouraging transferring inmates or detainees to a licensed acute facility and/or hospital for medical care in order to save money and resources;

I. A policy, custom or practice of failing to adequately monitor Corizon's performance to ensure it met staffing commitments and provided quality healthcare;

J.      A policy, custom or practice of "back-dating" medical records or "late entries" in medical records and charting; and

K.      A policy, custom or practice of failing to enforce and follow the contract terms requiring defendant Corizon to staff the jail with medical professionals licensed in the State of Michigan.

L.      A policy; custom or practice of failing to follow their own GI protocol.

M.      A policy, custom or practice of retaliating against inmates, detainees and their families for complaints about medical care.

73.    Corizon's contract with defendant Calhoun County required Corizon to comply with the National Commission of Correctional Healthcare, which provides the minimal standards of healthcare to inmates and detainees. Corizon did not comply with those standards and defendant Calhoun was aware of that failure.

74.    Defendant Calhoun County, acting under the color of state law, was aware of Mr. Dean's serious medical condition and needs and was deliberately indifferent to his medical condition and needs.

75.    Defendant Calhoun County acted in violation of Mr. Dean's fifth and fourteenth amendment rights under the United States Constitution.

76.    This deliberate indifference was the proximate cause of damage to Mr. Dean including, but not limited to, excruciating pain, and suffering loss of enjoyment of life and his resulting death.

### THIRD CAUSE OF ACTION FEDERAL TORTS CLAIMS ACT VIOLATION AGAINST DEFENDANT UNITED STATES

77.    Plaintiff realleges paragraphs 1-76 above.

78.    Defendant United States, through its agency, the Department of Homeland

Security, Immigration and Customs Enforcement (ICE), contracted with defendant Calhoun County to house its detainees.

79. The defendant United States knew that Corizon was providing medical care to the detainees at the jail.

80. As articulated above they also knew that Corizon and the defendant Calhoun County had an egregious and long-standing history of providing unconstitutional, grossly insufficient medical care to inmates/detainees they were obligated to serve.

81. The defendant United States knew that this substandard healthcare by Corizon was provided not only to the inmates/detainees at the jail but to inmates and detainees throughout jails and prisons around the country.

82. Defendant United States has a non-discretionary duty to ensure that the medical needs of inmates/detainees in its custody are provided constitutionally adequate medical care.

83. By continuing to place its detainees, like Mr. Dean, in the jail under the care of defendant Calhoun and Corizon after becoming aware of these issues, the defendant United States of America violated that duty.

84. This violation of duty was the proximate cause of damage to Mr. Dean including, but not limited to excruciating pain and suffering, loss of enjoyment of life and his resulting death.

85. On August 2, 2022, the plaintiff served a Form 95 administrative claim against The Department of Homeland Security, Immigration and Customs Enforcement by Certified Mail at 950 L'Enfant Plaza, SW, Washington, DC 20536.

86. On March 20, 2023, the claim was denied.

WHEREFORE, the plaintiff demands the following relief against defendants:

A.   A trial by jury;

B.     Compensatory damages to the Estate of Jesse Dean for past, present, and future damages including, but not limited to, Jesse Dean's death, pain and suffering, and loss of enjoyment of life, together with interest and costs as provided by law.

C.     Punitive damages against individual defendants;

D.     All ascertainable economic damages, including past and future loss of earnings and/or earning capacity;

E.     Costs, interest, and attorneys' fees; and

F.     Such other further relief as this Court may deem proper and just, including injunctive and declaratory relief as may be required in the interests of justice.

CLARENCE DEAN AUTHORITY
OVER THE ESTATE OF JESSE DEAN

By His Attorneys,

Dated: November 30, 2023     BY:     */s/ Lawrence A. Vogelman*
Lawrence A. Vogelman (#10280)
Shaheen & Gordon, P.A.
PO Box 977
Dover, NH 03821
lvogelman@shaheengordon.com

*/s/ D. Michael Noonan*
D. Michael Noonan, Esq. (#8214)
Shaheen & Gordon, P.A.
PO Box 977
Dover, NH 03821
mnoonan@shaheengordon.com

*Attorneys for Plaintiff, Clarence Dean, Personal Representative for the Estate of Jesse Dean*

17